The next case on the call of the docket is the agenda number two, case number 132016, Johnson v. Amazon.com. The attorney for the appellant ready to proceed? Please proceed counsel. May it please the court. My name is John Frawley, and I represent Lisa Johnson and Gail Miller Anderson. The Seventh Circuit has asked this court a straightforward question. Does the IMWL adopt the federal PPA's compensability exclusions for preliminary and post-preliminary activities? The answer is no for three reasons. First, the IMWL's text says nothing about the PPA, while also expressly adopting other parts of the FLSA. Second... Can I just say one real quick thing? The question is phrased as, does the Illinois law incorporate the federal law, correct? Yes, that's correct, Your Honor. Incorporate. What do you mean? What do you think the question means? Is it to incorporate one statute into another? Well, Your Honor, in the context of State law versus Federal law, the only way to incorporate a Federal law is by express adoption or express incorporation. So the IMWL does directly incorporate several provisions of Federal law, just not the preliminary and post-preliminary activity language from 29 U.S.C. 25482. Now Your Honor, beyond the statutory text, the second reason that the IMWL does not incorporate the PPA is the IMWL's regulations directly contradict the PPA. Third, the IMWL's legislative history says nothing about the PPA, while also making clear that the IMWL is meant to be more generous to workers than Federal law. So I want to start by talking about the statutory text. We cited a number of decisions in our briefs that stand for the proposition that one law cannot adopt another law or an external standard by remaining silent as to that other law or that other external standard. So that matters in this case because the IMWL is completely silent as to the PPA. It doesn't cite any PPA code sections, it doesn't reference any PPA regulations, and most importantly, it doesn't speak in any language that remotely resembles the language used in the PPA. What the PPA does is it says that employers do not have to pay a Federal minimum or overtime wage rate for the mandatory activities that are preliminary or post-liminary to an employee's principal work activity. So under Federal law, the only thing you have to pay for is principal work activities. The IMWL doesn't even use those phrases. It doesn't talk about principal, preliminary, or post-liminary activities, and it does not subdivide the compensability of mandatory work activities under any similar categories. All the IMWL does is it says that you have to pay your employees for all the hours worked on your behalf. So, Your Honors, I think in these circumstances, to read the PPA into the IMWL would really be a legislative act. It would be adding text, adding a limitation to the law where the General Department of Labor has a limitation on worker wages. So that raises serious concerns under the principles of Federalism, which say that state law stands independently of Federal law. That's one of the reasons that the Illinois Attorney General and the Illinois Department of Labor wrote an amicus brief in this case, urging the Court not to read a Federal law into a state law silent as to that Federal law. As the Attorney General and the Department of Labor pointed out, that would risk depriving the General Assembly of its prerogative to make policy choices that differ from the policy choices of the Federal Government. Now these concerns about Federalism, they've arisen in many cases very similar to this case across the country. There are now five state Supreme Courts that have already held that a state wage law silent as to the PPA does not adopt the PPA. So, Your Honors, I think in this case, the statutory silence is enough to answer the question presented. The IMWL doesn't incorporate the PPA simply because it does not say that it incorporates the PPA. Now, even if Your Honors disagree with me on that point, there's additional textual evidence that shows that the IMWL does not incorporate the PPA and in fact rejects the PPA. This Court frequently recognizes the interpretive canon, it's called the expressio unius canon, under which the expression of one thing in the law implies the exclusion of other things. So this frequently comes up in cases that involve lists of exemptions. In those cases, this Court and other Illinois Courts recognize that the enumeration of exemptions signals that General Assembly's intent to have only those listed exemptions in the law and to reject any exemptions not listed in the law. So that's the exact situation presented in this case. The IMWL has a list of overtime exemptions. Several of those overtime exemptions expressly incorporate federal overtime exemptions and there's several additional exemptions on the IMWL's list that are patterned nearly word for word off of federal overtime exemptions. But the IMWL does not incorporate all federal exemptions. There's a total of over 45 federal overtime exemptions. There's only 12 IMWL exemptions and as the Court knows from the briefing in this case, the PPA is one of those overtime exemptions that the General Assembly left off of its list. So we know what the legislature did in this case. It looked through federal law. It picked out the specific federal exemptions that it liked and it left out the rest. Counsel, they did it 30 years later, right? Yes, Your Honor. Yes, Your Honor. And as Amazon points out in its brief, that means that the General Assembly is presumed to have been aware of the PPA at the time that it was enacting the IMWL's overtime provision. Now even back in 1976, Your Honor, the General Assembly included overtime exemptions in the IMWL's overtime provision and there were four original overtime exemptions. All four of those original overtime exemptions were patterned off of federal exemptions. So, and there was much more than four federal overtime exemptions back in 1976. So, Your Honor, even back in 1976, we know what the legislature was doing. It was looking at federal law. It was picking out the specific federal overtime exemptions that it liked and it was writing those exemptions into the state law. So in this case, because there is a long list of federal overtime exemptions that have not been added to the state law, I think under the expressio unius canon, the Court can make a finding that the General Assembly was reluctant to reject the PPA. Now Your Honor, before I move on from my textual argument, I want to say a brief word about Amazon's textual argument. I think that difference that I just identified in the number of state versus federal overtime exemptions really shows how dangerous Amazon's textual argument is. What Amazon's argument is, is that based on similarities in the baseline overtime provisions of state and federal law, the Court should go outside of the federal overtime provision, grab an exception, and read it into the state law. So there's really no limiting principle on that argument. Following that same logic could sweep all 45 plus federal overtime exemptions into the state law. That would drastically, drastically rewrite the state law. It would then compensate far fewer job activities and far fewer job positions. We ask the Court not to make that finding. Now Your Honor, beyond the statutory text, the IMWL's regulations also reject the PPA. By way of background, the IMWL gives the Illinois Department of Labor the express authority to make regulations defining terms within the IMWL. So I want to direct the Court's attention to Title 56, Section 210.1.10 of the Illinois Administrative Code. This is an IMWL regulation defining the term hours worked. So the term hours worked under Section 210.1.10 means all the time an employee is required to be on the employer's premises, on duty, at a prescribed workplace, and any additional time an employee is required or permitted to work for the employer. So in other words, all mandatory on-site time is compensable under Section 210.1.10. That's a direct conflict with the PPA that says that some mandatory on-site time is not compensable if spent on preliminary and post-preliminary activities. I want to give the Court an illustrative example to show the difference between 210.1.10 and the PPA. Think about the preliminary activities at issue in the Tennessee Coal decision that Amazon cited in its brief. This was a decision about iron ore miners. The miners would show up to work every day at the entrance or portal to a mine. They would take a boxcar down to the floor of the mine, and there they would pick up heavy mining equipment as well as 50-pound sacks of dynamite, and they would carry that heavy material up to two miles through underground tunnels to what was called the face of the mine. The face of the mine is where they would complete their drilling and loading activities. That's what they were originally paid for. Now the PPA was passed in part to render preliminary activities like the ones I just described non-compensable to make things like carrying heavy equipment two miles through underground tunnels non-compensable. That type of activity is clearly compensable under Section 210.1.10. It's mandatory on-site activity, so it falls under one of the categories of Section 210.1.10, and it's also clearly work under the plain dictionary definition of that term, so it falls under another category of Section 210.1.10. So because there's a direct conflict between the regulations and the PPA, and IMWL regulations, according to this Court, have the force and effect of law, the Court should read the IMWL's regulations to reject the PPA, even if it involves safety. Well, yes, Your Honor. I mean, under Section 210.1.10, the pertinent term is the term required. So it's actually an employer-friendly standard, in a way, because the employer controls what they're going to pay the employee for. If you require your employee to do something, then you have to pay your employee to do that thing. Now, Your Honor, under Amazon's interpretation, Amazon focuses on another IMWL regulation, Section 210.1.20. This is the regulation that says that the Illinois Department of Labor may, if it chooses, look to federal law in interpreting the IMWL. So Amazon reads that permissive regulation almost like a mandatory regulation directing the Illinois Department of Labor to look to federal law for guidance. So that doesn't make sense in view of the way the regulation is worded, and it also doesn't make sense in view of some other provisions of state and federal law that show that state and federal law certainly may diverge from one another. So 29 U.S.C. 218 is a provision in the FLSA that explicitly states that states can make wage laws that have more demanding requirements. They're stricter on employers than the federal law. The Illinois Department of Labor also has a regulation that says the same thing. In Section 210.1.100, it says that between state and federal law, the stricter of the two laws shall prevail. So it should be no surprise that in a case like this, the Illinois Department of Labor has not read state and federal law co-extensively because state and federal law differ from one another in this case. Your Honors, I want to close by saying a few words about the legislative history in this case. As we discussed earlier, the IMWL's overtime provision was passed 29 years after the PPA, and despite that fact, the General Assembly didn't include any PPA language among the list of original exemptions to the IMWL's overtime provision. Now, this process of selectively adopting just some parts of federal law has continued since 1976. The General Assembly has repeatedly taken federal overtime exemptions and adopted them by express reference into the IMWL. It did so twice in 1977. It did so again in 2004. It did so again in 2016. So the point I'm trying to make here is that when the General Assembly wants to adopt a federal overtime exemption, it knows how to do that, and it does that expressly. It either directly references the code section of the FLSA that it seeks to incorporate, or it patterns an exemption nearly word for word off of the federal overtime exemption. The General Assembly has never done that for the PPA. Now, Your Honor, I think that the General Assembly's decision not to adopt the PPA's limitation on workers' wages should come as no surprise in this case, because the General Assembly has consistently made the IMWL more generous to workers than federal law. The IMWL has a higher minimum wage rate than the federal law. It has a longer statute of limitations. It permits treble damages, whereas the federal law does not. It permits 5 percent interest on damages compounded monthly, which is significant, whereas the federal law does not. And as I pointed out earlier, it has far fewer exemptions than the federal overtime statute, which means that it compensates a broad range of activities and a broad range of job positions. So again, in these circumstances where almost every piece of the IMWL is more generous than federal law, I think it makes sense that the General Assembly chose not to adopt the PPA's limitations on worker wages. I'm happy to answer any questions the Court has. Otherwise, I ask the Court to answer the certified question in the negative. Thank you, Counsel. Good morning, Counsel. You may proceed with your argument. Good morning, Your Honors. Counsel, may it please the Court, I'm Gary Feinerman. I'm here on behalf of Amazon. The key question here is what the term work week, the statutory term work week, meant to the General Assembly when it enacted Illinois' overtime provision in 1976. As we've just heard, the plaintiffs say that the General Assembly understood work week to mean what the U.S. Supreme Court mistakenly thought it meant for a brief spell between 1944 and 1946, an understanding that Congress declared erroneous and emphatically rejected in 1947. The plaintiffs are wrong. The General Assembly in 1976, if we were legislating on those years in 1976 in the General Assembly, what would we have understood work week to mean? We would have understood it to mean what it had meant to Illinois employers, employees, and courts for nearly three decades prior, a meaning that did not include preliminary activities. Had the General Assembly intended to displace that fundamental aspect of overtime law, upsetting long-settled expectations and reinstating a regime, a three-year regime that Congress had found disastrous, surely somebody would have said something. But nobody said anything of the sort, not the bill's sponsor, not its opponents, and not litigants or courts for the next 45 years. So what does that silence mean? Plaintiffs have one answer and we take the opposite view. The silence can mean only that the General Assembly intended to carry forward under Illinois law the post-1947 understanding of work week. And that is just settled interpretive principles under Illinois law and federal law and other law. When a legislature uses a statutory term that has a long-settled established meaning, like work week did here, that silence means adoption, not rejection. And that was in 1976. Since 1976, federal district courts have held that Illinois law is on par, Illinois overtime law is on par with federal overtime law in this area. If the General Assembly were dissatisfied over those decades with that state of affairs, it surely would have stepped in and amended the Illinois law, but it did not. So what plaintiffs are asking you to do here is to upend an 80-year history, 79 actually, from 1947 to 1976 when the only federal overtime law prevailed in Illinois, and from 1976 to the present when Illinois overtime law existed alongside federal overtime law, under which the work week, the term work week, did not include preliminary activities. And as the retail merchants and its fellow amici note in their brief, imposing that kind of retrospective, unplanned liability would be devastating, especially for small businesses. And that's, those are precisely the consequences. Counsel, can we talk about work week and preliminary and post-preliminary? The federal court indicated that, you know, preliminary is something that would not be required for their principal activities and I think they listed those as stacking boxes or something like that. They're not integral or indispensable to plaintiff's principal activities of moving boxes, stacking packages and loading boxes. In this circumstance, would any of those employees be allowed to do any of that activity had they not submitted to this testing? In order to get into the facility during COVID for the protection of the workers and the employees, would they be allowed to do any of their principal activities without submitting to that test? No, they wouldn't have. They had to take the COVID, they had to do the COVID screening, which was just a temperature test. It wasn't that long Q-tip. So in terms of whether or not they were indispensable and integral to their activities, if they couldn't do those activities unless they did this test, how can it be said not to be integral and indispensable? Under settled overtime principles that interpret what's integral and dispensable, that kind of screening is not integral and indispensable because it isn't connected in a necessary way to the loading and the stacking of boxes. And so, for example, let's say that there was a case, I think it was Steiner in the U.S. Supreme Court, and the question was, is putting on gear that protects you from those materials, is that integral and indispensable? The answer is yes, because you cannot do that job under any circumstances without wearing that gear. Whereas in the integrity staffing case, the question was whether security checks as the employees were leaving the facility, were those integral and indispensable? And remember, the employees could not work at that job unless they agreed to submit to that security screening afterwards. And the Supreme Court said that that security screening was not integral and indispensable to that principal activity. And what we have here, the COVID screening, the temperature check and the questions, is on par with the security screening and integrity staffing as opposed to the putting on the protective clothing in the Steiner case. And I don't even understand claims to be questioning that conclusion. The federal claim in the district court and in the 7th Circuit presented that question, and the district court ruled that it wasn't, that the COVID screening was not integral or indispensable. And the plaintiffs don't even challenge that here. So you don't see that as being any different than, or being the same as the protective gear. I mean, with the battery, I mean, it wasn't that they couldn't do the job, it was that it would be unsafe to do that battery job without protective gear. That's right. And here's the difference. Whether there's COVID or not, whether it's February or November or July, whenever and under what circumstances, whatever is going on in the world, you cannot work in that battery plant safely without having that protective gear. Whereas COVID was fortunately a temporary circumstance, and it's just not integral or indispensable to the stacking of boxes. It's really the COVID testing and the COVID phenomenon was exogenous to what those principal activities were. And again, I'll just note that the plaintiffs had not challenged that determination by the district court that this is more of an integrity staffing situation as opposed to a Steiner situation. It's not preserved. They didn't argue it in the 7th Circuit because they didn't challenge the dismissal of their federal claim, and they have not raised that issue here. Counsel, I want to get back to what you started to say regarding the monetary impact of this. My first question is, is that something we should even consider in making our decision? Yes, it is, because the monetary impact would have been on the minds of the legislators in 1976 when they were deciding when they were adopting the Illinois overtime provision and using the term work week. They're presumed to have known what happened before, and in addition to knowing what work week had meant for the prior 29 years since the Portal Act was enacted, they also would have known what Congress said in 1947 when it enacted the Portal Act. And what Congress said is that imposing this kind of overtime regime, including preliminary and post-preliminary activities, within the work week would be financially disastrous. Congress declared it an emergency and took immediate action to correct the U.S. Supreme Court's incorrect interpretation of the word work week that had existed in Section 207A1 of the Federal Act. We know that one of the statutory construction tenets is we don't want to construe statutory language in such a way that it leads to absurd results. Are you suggesting that this would be an absurd result to not read this into the statute or not determine that the statute does incorporate it? I think under these circumstances, it would be a manifestly incorrect result. Given the 29-year history that preceded the 1976 adoption of Section 4A, which is the Illinois overtime provision, this is a term that had a settled meaning. Everybody knew what it meant. Illinois employers knew what it meant. Employees knew what it meant. Courts knew what it meant. And if the General Assembly had intended such a fundamental change in what work week meant, that term that had a settled meaning and that employers and employees had come to rely on, it would have made itself clear somehow, in some way, either in the text of the statute or in the legislative history in the lead up to that. And the fact of the matter is nobody said anything. So when you have a word, work week, that has a meaning for 30 years, that employers and employees relied upon, that courts implement, and you use that same term, if we're legislators in the State House in 1976, and somebody says, and there's a bill that was to become Section 4A, and it has the word work week, and you're thinking about what does work week mean, it's very clear what work week meant at that point for 30 years. There is that long history. And if there had been a change contemplated in what work week meant, again, somebody would have said something. But nobody said anything. To the contrary, Representative Hanrahan, who was the House sponsor, said that the goal of the 76 Act was a makeup bill to catch up and make us even with federal laws that cover most employees in Illinois. And that's a take- Do we have an ambiguity here? Because we don't get to what you're quoting unless we find an ambiguity. There is no ambiguity because the term work week had a settled meaning. If you do think that it could go one way or the other, and the 7th Circuit apparently thought it could go one way or the other, their courts, different state Supreme Courts, have gone one way or the other. So if you think there is an ambiguity, then we turn to legislative history. And again, this is the House sponsor. He's standing up and encouraging his colleagues to adopt this 76 Amendment that included for the first time in Illinois an overtime provision, 4A, and he says this is a makeup bill to catch up and make us even with, not to exceed, to make us even with federal laws that cover most employees in Illinois. And we quoted that language, and it's at page 74 of the supplemental appendix. We quoted that language in our brief and the plaintiffs in their reply at pages 21 to 22 said, oh, what Representative Hammerhand meant by that was that Illinois was, the original Illinois statute didn't cover, didn't cover employees that were covered by the federal law. And the 76 Act said, no, they'll be coterminous. But that's not the only thing Representative Hammerhand was referring to. On the next page, page 75 of our supplemental appendix, in explaining the ways in which the Illinois law would make Illinois, the 76 law would make Illinois even with federal law, Representative Hammerhand expressly referenced the new overtime provision. He said, in the areas of employment and time and a half provisions, to make our minimum wage law a fair standard act, which is what the federal act is called, we come into the overtime provisions. So we have the House, not only do we have this 30-year history, sorry, 29-year history of what work we've done, we have Representative Hammerhand saying, this bill will make Illinois law even with federal law. And then he went on in cataloging the ways in which Illinois law would be made even with federal law, made express reference to the federal overtime provision. And none of the opponents who stood in opposition to the 76 Act indicated any understanding that the Illinois workweek would be broader than the federal workweek, broader in a way that Congress in 1947 had declared a disaster for employers and for collective bargaining and the like. And then Representative Leinenweber, and his remarks are on page 76 of the supplemental appendix, he was opposing even making Illinois law even with federal law. Had there been any notion in that building across the street that what this 76 bill would do, the overtime provision would do, was not only make Illinois law even with federal law, but broader than federal law with respect to the definition of workweek, the understanding of workweek, which for 29 years prior did not include preliminary activities. Had there been any notion that this bill would go beyond federal law, surely Representative Leinenweber, who was no shrinking violet, would have said something. So your argument, in part, is based on the legislative history or what was going on in 76 that it wasn't necessary for the legislature to write in any exclusion? That's correct. In other respects it has, but not in this case. Right. In terms of this fundamental aspect of Illinois overtime law, the what of the law, what is covered by overtime, what is work, what falls within the workday, what falls within the workweek, something that had not been in flux for 29 years since the PPA was enacted, the PPA was enacted. And so in that situation there was no need to elaborate any further given the settled meaning that that term had had for the past 29 years. So that's exactly right and that's what the Sixth Circuit held in the Vance case and that's what the Oregon Supreme Court held in the Buero case. And I see that my light is on. I do want to mention an argument that the plaintiffs made in their reply. It's at pages 2-8 of their reply. And what they say is that section 254A-2, which is the preliminary post-preliminary provision of the FLSA, did not address would activities fall within the workweek, but rather that it intended to maintain Anderson's, the U.S. Supreme Court's 1946 understanding that preliminary activities fall within the workweek, but merely provided that such activities are not compensable. And that's flatly incorrect, but let's pause for a moment and ask why the plaintiffs have staked their case, giving it pride of place in their reply, on that proposition. And the reason is that they know that if the federal workweek did not include preliminary activities, then neither does the Illinois workweek, given the legislature's adoption of that term. And that's because they must know that when the General Assembly in 76 intended, that they intended to adopt the long-settled federal understanding of workweek. So what the plaintiffs are thinking is that we need to take, we need to have a situation where workweek includes preliminary activities and that was not changed in 1947. The plaintiffs cite no authority for their view, and it's wrong. I point the court's attention to the IBB case at pages 28 to 29, where the court said, other than its express exceptions for activities that are preliminary and post-preliminary to that principal activity, section 254A2 does not purport to change the court's earlier descriptions of work and workweek. That's a pretty big other than, and yet that didn't stop the plaintiffs on pages 9 and 10 of their opening brief from omitting that portion of IBP. There are a number of federal regulations that make clear that the workweek does not include preliminary or post-preliminary activities. Section 790.6, both A and B, 785.7, which said that the PPA did not change Anderson's rule defining workweek except for preliminary and post-preliminary activities. Again, 254A2 rejected Anderson insofar as it pertains to preliminary and post-preliminary activities, and also section 790.7A. I see that my time is up, unless there are any further questions. We urge the court to answer the certified question in the affirmative. Thank you, counsel. Your Honor, it's the argument that you just heard. I think it misinterprets both state law and federal law. So the federal definition of workweek does not include preliminary and post-preliminary activities. But regardless, Illinois does not adopt the federal definition of the term workweek. So let me start with the federal definition of workweek. It's in 29 CFR 785.7. It adopts the Anderson definition, and it includes all of an employee's mandatory on-site time without stating that preliminary and post-preliminary activities are excluded. Now, Amazon, opposing counsel, just argued that the PPA changed that definition, but it didn't change that definition. Just look at the PPA's text. It doesn't even include the term workweek, much less purport to redefine that term. So this is one of the reasons why in the IBP v. Alvarez decision that opposing counsel explicitly stated that the PPA did not purport to change the definition of the term workweek other than to create exceptions. Now, I think opposing counsel is confusing the difference between a rule or a term definition on one hand and an exception to that rule or that term definition on the other hand. The existence of exceptions doesn't change the statement of an underlying rule. A rule and an exception have distinct semantic content. So that's why the PPA didn't change the definition of workweek in federal law, and that's why a state theoretically could adopt the federal definition of the term workweek without rendering preliminary and post-preliminary tasks noncompensable unless the state also adopted the PPA. Now, because Illinois clearly does not adopt the federal definition of the term workweek, all it does is use the word workweek in the IMWL's overtime provision. That provision doesn't direct the reader to look to federal law for the definition of workweek. It doesn't include its own independent definition. So in these circumstances, either the plain dictionary definition of the term workweek controls or if there's an on-point regulation, that can control the definition of workweek under the IMWL because the IMWL expressly grants the Illinois Department of Labor the power to issue regulations defining terms. So in this case, we have this very useful regulation, Section 210.110, which gives color to the definition of workweek under the IMWL because it defines hours worked. Now, that definition has four categories, and that's important because the federal definition of workweek only has three. I'm going to say this again. I stated it in my opening argument, but the definition of workweek under Section 210.110 is all the time an employee is required to be on the employer's premises, required to be on duty, required to be at a prescribed workplace, and any additional time the employee is required or permitted to work for the employer. That fourth category does not exist under the Anderson definition. It doesn't exist under federal law. So the IMWL's regulations have signaled this express departure from federal law. The regulations are broader. They're more generous to workers than the federal definition of workweek. So Illinois can't adopt the federal definition of workweek. Now opposing counsel, nevertheless, argues that Illinois inherited, I think the quote is the settled or common meaning of the term workweek, from federal law. That's not how the law works in a federalist system. There's not a mechanism by which a state will automatically inherit meaning from a federal law other than by express incorporation. There is no express incorporation in this case because the state overtime provision doesn't direct the reader to look to federal law for the definition of workweek. My honors, I want to address this argument that there would be disastrous effects of ruling in our favor, and that there would be a flood of litigation similar to the flood that followed the passage of the federal FLSA before the PPA was passed. That wouldn't happen in this case. So the reason there was so much litigation following the FLSA before the passage of the PPA was that the FLSA was a first-of-its-kind law that imposed retroactive liability with no statute of limitations. So you literally had a situation where employers were being sued for violations of a law that occurred ten years prior when the law didn't even exist. So that's not the situation presented in this case. The IMWL has been on the books since 1971. Its overtime provision has been on the books since 1976. The section 210.110, hours worked definition, has been on the books since 1985 and has never changed since that time. And the IMWL has a three-year statute of limitations. So this is nothing like the situation presented by the original FLSA. There wouldn't be disastrous consequences of ruling in our favor. Now, I think there would be negative consequences of ruling for Amazon because you're going to hurt workers who are not going to be paid for all their mandatory work. It's also going to hurt state tax revenues because you won't have any employment taxes associated with preliminary and post-preliminary activities anymore. And those activities can be very lengthy. In the Amaya decision that we cited in our brief, the preliminary activities took two hours per worker per day. Two hours per worker per day. And that wouldn't be compensated under federal law. So, even beyond those consequences, I'd also point out that if you rule in Amazon's favor, you're setting a new standard that's going to really burden the legislature. All of a sudden, the legislature has to expressly disavow every federal law that touches on a topic remotely related to the topic on which the General Assembly is legislating just to prevent courts from reading federal law into silent state laws. That's a burden that multiple other state Supreme Courts have talked about in finding that silent wage laws do not adopt the PPA. Your Honors, opposing counsel made a point. He said, in this case, silence means adoption of federal law. As I just pointed out, silence doesn't mean adoption of federal law, but I will say there is a principle under which a legislature will acquiesce to an external meaning, but it's not the way that Amazon thinks. This is the principle of acquiescence to an administrative regulation. So, this is the principle from the Burkett decision we cited, from the Hughes decision that Amazon cited, that if there is a regulation that's on the books for a long period of time and the General Assembly doesn't disturb it, even though the General Assembly does alter other parts of the relevant statutes, then the General Assembly will be presumed to acquiesce to the meaning of the regulation. So, that applies to Section 210.1.10. It's been on the books, as I said, for 40 years, and it explicitly rejects the PPA as the Illinois Attorney General and the Illinois Department of Labor pointed out in their amicus brief. So, if anything, the General Assembly has adopted Section 210.1.10. Your Honors, I want to close. One of your Honors made a point about ambiguity, statutory ambiguity in this case. I think if you looked at every argument that opposing counsel made today, the best you could say is that Amazon has shown that the IMWL is ambiguous about whether it adopts the PPA or not, because there's no express adoption. You couldn't argue for express adoption. So, there's two principles of interpreting ambiguous statutes that swing in our favor if the IMWL is ambiguous. The first is that an ambiguous piece of remedial legislation will be construed liberally to effectuate its purposes. While the purpose of the IMWL is to protect workers' well-being and their wages, that means it shouldn't be read to adopt a limit on workers' wages like the PPA. The other principle of interpreting ambiguous statutes was also outlined in the Burkett decision. This is the principle that where there's an ambiguous statute, an agency interpretation of that statute gets special weight and deference. Well, as I've said multiple times today, Section 210.1.10 rejects the PPA. So, if the IMWL is ambiguous about incorporating the PPA, the court should read Section 210.1.10 to reject the PPA. I ask the court to answer the certified question in the negative. Thank you, counsel. Case number 132016, Johnson v. Amazon, is taken under advisement as agenda number two. The court would like to thank the attorneys for their arguments.